1

2

3

4

5

6

7                          **UNITED STATES DISTRICT COURT**

8                               **DISTRICT OF NEVADA**

9
    WILLIAM WITTER,                    )
10                                     )
                    Petitioner,        )        2:01-CV-1034-RCJ-CWH
11                                     )
    vs.                                )
12                                     )        **ORDER**
    RENEE BAKER, *et al.*,             )
13                                     )
                    Respondents.       )
14                                     )
    _____/
15

16          Before the court for a decision on the merits is an application for a writ of habeas corpus filed

17   by William Witter, a Nevada prisoner sentenced to death.  ECF No. 167.

18          I.  FACTUAL AND PROCEDURAL HISTORY

19          On June 28, 1995, a jury in the Eighth Judicial District Court for Nevada found Witter guilty

20   of first degree murder with use of a deadly weapon, attempted murder with use of a deadly weapon,

21   attempted sexual assault with use of a deadly weapon, and burglary.  The facts of Witter's case are

22   recounted in the Nevada Supreme Court's decision on Witter's direct appeal:

23               On November 14, 1993, Kathryn Cox (Kathryn) was working as a retail clerk
            for the Park Avenue Gift Shop located in the Luxor Hotel in Las Vegas, Nevada.
24          James Cox (James), Kathryn's husband, drove a taxicab in the Las Vegas area.  At
            about 10:25 p.m., Kathryn called James and informed him that she was having trouble
25          with her car and needed assistance.  James told her that he would be over to pick her
            up in about twenty-five to thirty minutes.  Kathryn returned to her car, got in, locked
26          her door, and began to read a book.

1
2
3
4
5
6
7

About five to ten minutes later, the passenger side door opened, and William Witter got into the car.  Witter demanded that Kathryn drive him out of the lot.  When Kathryn informed him that she could not, Witter stabbed her just above her left breast.  Witter pulled Kathryn closer to him and told her that he was going to kill her.  After stabbing Kathryn several more times, Witter became quiet, unzipped his pants and ordered Kathryn to perform oral sex.  Kathryn attempted to comply with his demands, but because she had a punctured lung, she kept passing out.  Witter pulled Kathryn into a sitting position and told her, "You're probably already dead."  Kathryn managed to open her door and attempted to run away, but was only able to get about ten or fifteen feet before Witter caught her.  Witter forced Kathryn back into the car and forced her to kiss him.  He then used his knife to cut away Kathryn's pants and began to fondle her vaginal area with his finger.

8
9
10
11
12

Kathryn observed her husband's cab pull up next to the driver's side of her car.  Witter, not knowing that James was Kathryn's husband, held Kathryn close and stated, "Don't say anything. I'm going to tell him that you're having a bad cocaine trip."  James opened the driver's side door of Kathryn's car and told Witter to get out.  Witter got out of the car, walked over to James, and stabbed him numerous times.  James fell backwards and into Kathryn, who had gotten out of the car, knocking her to the ground.  Kathryn got up and ran for a bus stop.  Once again, Witter caught Kathryn and carried her back to her car.  After pulling the rest of Kathryn's clothes off, Witter attempted to stuff James' body underneath James' cab.  Kathryn then heard hotel security approaching her vehicle.

13
14
15

A security officer in charge of patrolling the Excalibur Hotel's employee parking lot approached Kathryn's car and confronted Witter.  After a short standoff, the security officer's backup arrived, and Witter was subdued.  Paramedics arrived a short time later, and Kathryn was taken to the hospital where she eventually recovered from her injuries.  James was already dead when the paramedics arrived.

16  *Witter v. State*, 921 P.2d 886, 890-91 (Nev. 1996).

17  On July 13, 1995, the jury imposed a sentence of death for the murder.  On August 11, 1995,

18  the state district court filed the amended judgment of conviction.  Witter appealed.

19  On July 22, 1996, the Nevada Supreme Court affirmed Witter's conviction and sentence.

20  After the Nevada Supreme Court denied Witter's petition for rehearing, he petitioned the United

21  States Supreme Court for a writ of certiorari.  On May 12, 1997, the Court denied Witter's petition.

22  On October 27, 1997, Witter filed a petition for writ of habeas corpus in the state district court.  On

23  February 26, 1999, the state district court held an evidentiary hearing on the petition.  On September

24  25, 2000, the court entered a written order denying relief.  Witter appealed.

25  On August 10, 2001, the Nevada Supreme Court affirmed the lower court's decision.  On

26

2

1    September 4, 2001, this court received Witter's initial petition for writ of habeas corpus pursuant to

2    28 U.S.C. § 2254.  ECF No. 5.  Though nominally filed in *propria persona*, the petition appears to

3    have been prepared by, or with the assistance of, state post-conviction counsel, David Schieck.

4            On September 17, 2001, this court appointed the Federal Public Defender's office (FPD) to

5    represent Witter.  The FPD entered a notice of appearance on February 2, 2002.  On November 23,

6    2005, after protracted discovery litigation and several extensions of time, Witter filed an amended

7    petition for writ of habeas corpus advancing twelve grounds for relief.  ECF No. 67.

8            From November 30, 2006, to April 7, 2011, proceedings were stayed to allow Witter to

9    exhaust state court remedies in relation to the claims contained in his amended petition for habeas

10   corpus relief (ECF No. 67).  ECF Nos. 139-163.

11           During that stay, Witter returned to state district court and filed a second state habeas petition

12   on February 14, 2007.  The state district court denied Witter's second state habeas petition.  Witter

13   appealed.  The Nevada Supreme Court affirmed the denial of the petition.  In its order of affirmance,

14   the Nevada Supreme Court found that Witter's petition was procedurally barred as untimely under

15   Nev. Rev. Stat. § 34.726(1) and successive under Nev. Rev. Stat. § 34.810(1).

16           During the pendency of his second state habeas petition, Witter filed a third state habeas

17   petition on April 28, 2008.  The state district court also denied this petition.  Witter appealed.  On

18   November 17, 2010, the Nevada Supreme Court affirmed the denial of Witter's third state habeas

19   petition in an unpublished opinion.  In its order of affirmance, the Nevada Supreme Court found that

20   Witter's third state habeas petition was procedurally barred because the claim raised therein was

21   appropriate for direct appeal and thus subject to dismissal under Nev. Rev. Stat. § 34.810, and

22   because Witter had in fact raised the claim on direct appeal and it was denied on the merits.

23           As noted, proceedings were reopened in this case on April 7, 2011.  ECF No. 163.  Witter

24   filed a second amended federal petition for writ of habeas corpus on July 22, 2011.  ECF No. 167.

25   On September 13, 2011, respondents filed a motion to dismiss claims in the petition on procedural

26

3

grounds. ECF No. 173. Pursuant to that motion, this court dismissed several claims from the second amended petition. ECF No. 213. Claims One(A), Two, Four, Five(B), Seven(A), Ten(C), and Fourteen remain before the court for a decision on the merits.

II. STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. "[A] federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the

4

doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 131 S.Ct.1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1398. In *Pinholster*, the Court reasoned that the "backward-looking language" present in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made," and, therefore, the record under review must be "limited to the record in existence at that same time, i.e., the record before the state court." *Id*.

For any habeas claim that has not been adjudicated on the merits by the state court, the federal court reviews the claim *de novo* without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1). *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). *See also James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011) (noting that federal court review is *de novo* where a state court does not reach the merits, but instead denies relief based on a procedural bar later held inadequate to foreclose federal habeas review). In such instances, however, the provisions of 28 U.S.C. § 2254(e) still apply. *Pinholster*, 131 S.Ct at 1401 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); *Pirtle*, 313 F.3d at 1167-68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is *de novo*).

5

1    Lastly, the Court in *Lockyer* rejected a Ninth Circuit mandate for habeas courts to review

2  habeas claims by conducting a *de novo* review prior to applying the "contrary to or unreasonable

3  application of" limitations of 28 U.S.C. § 2254(d)(1).  *Lockyer*, 538 U.S. at 71.  In doing so,

4  however, the Court did not preclude such an approach.  "AEDPA does not require a federal habeas

5  court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) –

6  whether a state court decision is contrary to, or involved an unreasonable application of, clearly

7  established Federal law."  *Id.*

8    III.  ANALYSIS OF CLAIMS

9    **Claim One(A) and (C)**

10    In Claim One(A) and (C), Witter alleges that his sentence is unconstitutional because the

11  State presented false evidence that he was a member of a street and prison gang called the Nortenos.

12  In the sentencing phase of Witter's trial, the State elicited testimony from two San Jose police

13  officers about the Nortenos and indicia that Witter may have been affiliated with that gang.

14    In Claim One(B), Witter alleges that the State knowingly withheld information contradicting

15  its assertion that Witter was a member of this gang.  As explained in a prior order (ECF No. 213),

16  however, that portion of Claim One is barred by the statute of limitations and the doctrine of

17  procedural default.  To the extent that Witter insists the allegations contained in One(B) be made

18  part of the court's analysis here, all of Claim One is subject to dismissal on procedural grounds.

19    The Nevada Supreme Court adjudicated Witter's claim regarding gang evidence as follows:

20    Witter also contends that the district court erred in admitting evidence
     showing that he is a member of a street gang.  According to Witter, the evidence
21    lacked any probative value and was offered only to inflame the passions of the jury.

22    NRS 48.035(1) states that "[a]lthough relevant, evidence is not admissible if
     its probative value is substantially outweighed by the danger of unfair prejudice, or
23    confusion of the issues or of misleading the jury."  While this court has cautioned that
     the introduction of gang membership during a penalty hearing may be unfairly
24    prejudicial, *see Young v. State*, 103 Nev. 233, 737 P.2d 512 (1987); *Lay v. State*, 110
     Nev. 1189, 886 P.2d 448 (1994); *see also Dawson v. Delaware*, 503 U.S. 159, 112
25    S.Ct. 1093, 117 L.Ed.2d 309 (1992), this court has held that "[f]rom *Dawson*, we
     derive the following rule:  Evidence of a constitutionally protected activity is

26

6

1
2
3
4

admissible only if it is used for something more than general character evidence." *Flanagan v. State*, 109 Nev. 50, 53, 846 P.2d 1053, 1056 (1993).  In *Dawson*, the United States Supreme Court reasoned that "[a] defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future."  503 U.S. at 166, 112 S.Ct. at 1098.

5
6
7
8
9

In this case, the State presented testimony from the arresting officers indicating that Witter told them that he could heighten his reputation if he were to kill police officers, and from a second officer who stated that from the clothing Witter was wearing and from the tatoos on his arm, he believed that Witter was a member of a violent California gang known as the "Nortenos."  We conclude that this evidence tends to show that Witter posed a threat of future violence to the community. Moreover, we conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, or confusion of the issues or of misleading the jury.  Accordingly, we conclude that the district court properly admitted evidence of Witter's affiliation with a street gang.

10   *Witter*, 921 P.2d at 895.

11       The Nevada Supreme Court's decision is not contrary to, nor an unreasonable application of,

12   Supreme Court precedents, and therefore habeas relief is not warranted on this claim.  The evidence

13   Witter relies upon to argue that the officers' testimony was false or inaccurate was not before the

14   Nevada Supreme Court when it adjudicated this claim.  Thus, it cannot be part of the analysis here.

15   *See Pinholster*, 131 S.Ct. at 1398.  And, the Supreme Court "has not yet made a clear ruling that

16   admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient

17   to warrant issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009)

18       In *Dawson v. Delaware*, 503 U.S. 159  (1992), the Supreme Court held that the Constitution

19   does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations

20   at sentencing simply because those beliefs and associations are protected by the First Amendment.

21   *Dawson*, 503 U.S. at 165.  However, the information presented to the jury at Dawson's trial – i.e.,

22   merely that the Aryan Brotherhood was a white racist prison gang that originated in California

23   without any proof that the gang had committed, or even endorsed, any unlawful or violent acts – was

24   so narrow as to be irrelevant to any legitimate sentencing issue.  *Id*. at 166.  Because the evidence of

25   membership proved nothing more than Dawson's abstract beliefs, the Court held that the admission

26

7

1  of that evidence violated Dawson's First Amendment rights.  *Id*. at 167.

2       The Nevada Supreme Court correctly picked up on the distinction between the evidence at

3  issue in *Dawson* and evidence that bears upon an issue properly before the jury, such as whether or

4  not the defendant "represents a future danger to society."  *Dawson*, 503 U.S. at 166.  The Nevada

5  Supreme Court reasonably concluded that the gang evidence presented at Witter's trial did not

6  implicate his constitutional rights because there was a relevant connection between Witter's

7  affiliation with the Nortenos and the likelihood he would pose a threat to the community.

8       Claim One(A) and (C) is denied.

9                 **Claim Two**

10      In Claim Two, Witter alleges that he was deprived of his constitutional right to effective

11 assistance of counsel in the penalty phase due to his counsel's failure to present certain mitigating

12 evidence, primarily evidence related to fetal alcohol exposure, and to rebut evidence presented at

13 trial regarding Witter's alleged gang affiliation.  Other evidence that Witter claims counsel should

14 have presented includes the criminal records of certain family members, family court records

15 showing the abuse and neglect endured by Witter and his siblings, letters from Witter's co-workers,

16 the testimony of additional family members and acquaintances, and records related to Witter's

17 alcoholism and his prior conviction for assault with a deadly weapon.

18      Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S.

19 668 (1984)).  Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief: deficient

20 performance and prejudice.  466 U.S. at 687.  With respect to the performance prong, a petitioner

21 must carry the burden of demonstrating that his counsel's performance was so deficient that it fell

22 below an "objective standard of reasonableness."  *Id.* at 688.  A reviewing court "must indulge a

23 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional

24 assistance because it is all too easy to conclude that a particular act or omission of counsel was

25 unreasonable in the harsh light of hindsight."  *Bell v. Cone*, 535 U.S. 685, 702 (2002) (quoting

26

1   *Strickland*, 466 U.S. at 689).

2   　　　　With respect to the prejudice prong, the court must ask if the defendant has met the burden of

3   showing that the decision reached would reasonably likely have been different absent [counsel's]

4   errors. *Strickland*, 466 U.S. at 696. Put another way, a habeas petitioner "must show that there is a

5   reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

6   would have been different." *Id.* at 694.

7   　　　　The Court in *Strickland* emphasized that the ultimate focus of an ineffective assistance of

8   counsel inquiry must be on the fundamental fairness of the proceeding whose result is being

9   challenged. *Id.* If the defendant makes an insufficient showing as to either one of the two *Strickland*

10   components, the reviewing court need not address the other component. *Id*. at 697.

11   　　　　. . . In particular, a court need not determine whether counsel's performance was
      deficient before examining the prejudice suffered by the defendant as a result of the

12   　　　　alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's
      performance. If it is easier to dispose of an ineffectiveness claim on the ground of

13   　　　　lack of sufficient prejudice, which we expect will often be so, that course should be
      followed. . . .

14

15   *Id.*

16   　　　　Here is how the Nevada Supreme Court addressed Witter's claims that counsel was

17   ineffective by failing to present evidence regarding fetal alcohol syndrome and by failing to rebut the

18   State's gang evidence:

19   　　　　A claim of ineffective assistance of counsel presents a mixed question of law and fact,
      subject to independent review. [FN 3: *Kirksey v. State*, 112 Nev. 980, 987, 923 P.2d

20   　　　　1102, 1107 (1996).] To establish ineffective assistance of counsel, a claimant must
      show both that counsel's performance was deficient and that the deficient

21   　　　　performance prejudiced the defense. [FN 4: *Id*. (citing *Strickland v. Washington*, 466
      U.S. 668, 687 (1984).] To show prejudice, the claimant must show a reasonable

22   　　　　probability that but for counsel's errors the result of the proceeding would have been
      different. [FN 5: *Id*. at 988, 923 P.2d at 1107.] Judicial review of a lawyer's

23   　　　　representation is highly deferential, and a claimant must overcome the presumption
      that a challenged action might be considered sound strategy. [FN 6: *Strickland*, 466 U.S. at 689.]

24

25   　　　　　　First, Witter asserts that his trial counsel was ineffective during the guilt phase
      in failing to present evidence that he had fetal alcohol syndrome (FAS). Though the

26   　　　　record indicates that Witter's mother drank alcohol while pregnant with him, at the

evidentiary hearing Witter failed to provide evidence demonstrating that he suffers from FAS or any similar ailment.  Thus we conclude that Witter shows neither deficient performance by counsel nor prejudice.  Even if we assumed that evidence of FAS could have been presented, Witter fails to show that it would have made any difference.  He speculates that it could have provided "a defense to the requisite *mens rea* of premeditated murder."  Whatever the merits of this speculation, the State also charged a theory of first-degree felony murder and presented overwhelming evidence to support it.

Second, Witter maintains that his trial counsel was ineffective during the penalty phase because he did not call an expert witness "to explain away the graphic testimony about gangs and violence" and Witter's possession of a shank in prison.  On direct appeal, this court rejected Witter's claim that the trial court abused its discretion when it did not grant a continuance to allow defense counsel time to respond to the State's evidence on these matters.  [FN 7: *Witter*, 112 Nev. at 919-20, 921 P.2d at 894.]  We conclude that counsel's failure to present evidence on these matters did not prejudice Witter:  we already determined on direct appeal that such evidence had little mitigating value and its absence was not prejudicial.  [FN 8: *Id.* at 920, 921 P.2d at 894.]

See Docket No. 120-13, p. 3-4.[1]

After initiating this federal action, Witter generated additional evidence to show that he meets the criteria for fetal alcohol spectrum disorder (FASD),[2] most notably assessments by Natalie

---

[1]  Citations to page numbers in the court's electronic record for this case are based on CM/ECF pagination.

[2]

Fetal Alcohol Spectrum Disorder is an umbrella term that has been adopted to cover all prenatal alcohol-induced impairments including Alcohol Related Neuro-developmental Disorder (ARND), Fetal Alcohol Effects (FAE), and Fetal Alcohol Syndrome.  In order to diagnose a patient with Fetal Alcohol Syndrome, the patient must have "dysmorphic facial features, evidence of brain dysfunction, and prenatal and postnatal growth deficiency in the presence of prenatal alcohol exposure."  However, prenatal alcohol exposure does not guarantee that person will suffer from fetal alcohol syndrome.  In addition, the disabilities that accompany prenatal alcohol exposure will vary from person to person.  If a patient does not exhibit the facial features of FAS, then a diagnosis of one of the other disorders within the fetal alcohol spectrum is possible, but there must be evidence of cognitive and behavioral difficulties as well as a maternal history of prenatal alcohol exposure.

Christopher Fanning, *Defining Intellectual Disability: Fetal Alcohol Spectrum Disorders and Capital Punishment*, 38 Rutgers L. Rec. 1, 11 (2010) (footnotes omitted).

10

1   Novick Brown, Ph.D. and Michael L. Levin, M.D.  ECF No. 168-8, p. 57-74; ECF No. 168-13, p.

2   15-30.  Dr. Levin, who examined Witter in 2002, diagnosed him with FAS Type 3 or FAE.  *Id*.  Dr.

3   Brown, based on a review of Witter's records, agreed with that diagnosis.  *Id*.  Most of the additional

4   background evidence mentioned above was also developed subsequent to the beginning of this

5   federal case.

6          As noted above, however, a federal habeas court's consideration of evidence in support of a

7   claim that the state court has adjudicated on the merits is limited to evidence that was before the state

8   court at the time.  *Pinholster*, 131 S.Ct. at 1398.  Witter advances several reasons why *Pinholster*

9   does not impose an impediment to this court's consideration of additional evidence with respect to

10  fetal alcohol exposure.  First, he contends that the default of this claim, in the form it was presented

11  in his *second* state post-conviction proceeding, was either inadequate to bar federal review or,

12  alternatively, should be excused due to the ineffectiveness of counsel in the first state post-

13  conviction proceeding.  The court has already considered and rejected these arguments.  ECF No.

14  246, p. 4-6.

15         Next, Witter claims that the Nevada Supreme Court did not adjudicate the claim on the

16  merits because it construed it as relating to the guilt phase only.  As an alternative argument, Witter

17  contends that the Nevada Supreme Court's decision is contrary to, or an unreasonable application of,

18  clearly established federal law.

19         The Nevada Supreme Court's emphasis on the guilt phase aspect of the claim is

20  understandable in light of the way that Witter presented the claim throughout that proceeding.  ECF

21  No. 119-7, p. 17-23; ECF No. 120-7, p. 19-23; ECF No. 120-8, p. 1-4.  And, even though the claim

22  as presented in the first state post-conviction proceeding was more focused on the guilt phase, Witter

23  insisted in a prior submission to this court that that was the means by which the entirety of Claim

24  Two was exhausted.  ECF No. 195, p. 109.

25         The Nevada Supreme Court rejected the claim primarily because Witter had failed to make

26

11

1  any showing that he had been adversely affected by prenatal exposure to alcohol.  The state district

2  court found that Witter's trial counsel had made reasonable efforts to develop such evidence, but had

3  been unsuccessful.  ECF No. 120-3, p. 4-5.  The state supreme court's analysis as to the potential

4  prejudice in the guilt phase arising from trial counsel's alleged failure was in response to a specific

5  argument contained in Witter's brief.

6  Witter alleges that Nevada Supreme Court, despite having accurately recited the *Strickland*

7  standard, erred by applying it in a way that elevated the prejudice requirement.  In particular, he takes

8  issue with the court's statement that Witter had failed to show that counsel's alleged omission

9  "would have made any difference."  According to Witter, the statement indicates that the court

10  incorrectly asked whether it was "more probable than not" that counsel's performance affected the

11  outcome of the case.  ECF No. 227, p. 49 (citing *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1243

12  (9th Cir. 2005)).  This court does not agree.

13  As noted, the main reason the Nevada Supreme Court rejected the claim is that Witter had

14  not shown that he had been impaired by prenatal exposure to alcohol – a reasonable application of

15  the *Strickland* standard.  The court's alternative conclusion that the evidence would not have made

16  any difference anyway does not undermine the reasonableness of that decision.  Moreover, the

17  phrasing at issue can just as easily be interpreted as meaning there was *no probability at all* that the

18  result would have been different, which is also consistent with *Strickland*.  Accordingly, this court

19  concludes that the Nevada Supreme Court adjudicated the FASD-related portion of Claim Two on

20  the merits and its decision is entitled to deference under § 2254(d).

21  Similarly, Witter is not entitled to relief based on the portion of Claim Two premised on

22  counsel's alleged failure to rebut gang evidence and present additional mitigating evidence.  Again,

23  the court is foreclosed by *Pinholster* from considering much of the evidence Witter advances in

24

25

26

1   support of this claim.[3]   As noted in the excerpt from *Strickland*, above, the Nevada Supreme Court,

2   having found a lack of sufficient prejudice, was not required to address whether counsel's

3   performance was deficient.  And, despite Witter's argument to the contrary, the Nevada Supreme

4   Court applied the prejudice standard correctly and made an objectively reasonable decision.

5          Ground Two is denied.

6          **Claim Four**

7          In Claim Four, Witter alleges that the Nevada post-conviction court committed constitutional

8   error because, in its re-weighing analysis after finding three aggravating circumstances invalid, it

9   used the trial record to guess which mitigating circumstance the jury would have found.

10         In finding Witter eligible for the death penalty, the jury found the following aggravating

11  circumstances:  (1) the murder was committed during a burglary; (2) the murder was committed

12  during a sexual assault; (3) the murder was committed to avoid an unlawful arrest; and (4) Witter

13  had a prior violent felony conviction.  ECF No. 118-8, p. 28.  On direct appeal, the Nevada Supreme

14  Court concluded that the prevention of lawful arrest aggravator should have been stricken, but that,

15  even so, the remaining aggravators clearly outweighed the mitigating evidence.  *Witter*, 921 P.2d at

16  900.

17  _____

18         [3]   References in the materials Witter has submitted in this case make the court dubious of his
    claim that evidence presented by the State about his gang involvement was false.  For example, Dr.
19  Levin's report states that Witter "has had gang involvement while in prison prior to the Nevada
    incarceration" and that Witter "described gang involvement as part of 'sticking together' in prison and
20  a form of survival."  ECF No. 168-13, p. 22.  A report from Lewis Etcoff, Ph.D., a  psychologist who
    interviewed and examined Witter prior to trial, quotes Witter as saying the following about his time
21  confined by the California Youth Authority:

22         I was catching time left and right for gang involvement.  I didn't mind being there, you
           were young, you were on your own; there were all kinds of violence in there.  A lot of
           fighting, disrespecting counselors, attacking people with different things, all of our
23         enemies from L.A., jumping guys, stabbing them with pencils.  I got jumped a few times,
           but never stabbed.

24
    *Id*., p. 43.  Harrie Hess, Ph.D, another psychologist retained by defense counsel, reported that Witter told
25  him that, after moving to California from Hawaii, he spent much of his time incarcerated and some of
    the time "gang banging in Northern California."  ECF No. 168-14, p. 51.

26

The proceeding that gives rise to Claim Four is Witter's second state post-conviction proceeding wherein the state court invalidated two additional aggravating circumstances pursuant to *McConnell v. State*, 102 P.3d 606 (Nev. 2004).[4]  In that proceeding, the Nevada Supreme Court had determined that Witter had established good cause to overcome procedural bars to his *McConnell* claim, but that the requisite showing of prejudice was lacking.  Here is the relevant passage:

> Prejudice is shown if "there is a reasonable doubt that the jury would have returned a sentence of death absent any stricken aggravating circumstances."  *Bejarano v. State*, 146 P.3d 265, 270-71 (Nev. 2006).

> This court must therefore decide whether it is beyond a reasonable doubt both that the jury would have found Witter death eligible and that the jury would have selected the death penalty absent the erroneous aggravating circumstances.  If the court cannot make both determinations, then a new penalty hearing is required.  *See Hernandez v. State*, 194 P.3d 1235, 1240-41 (Nev. 2008); *Bejarano,* 146 P.3d at 276; *Leslie v. Warden*, 59 P.3d 440, 448 (Nev. 2002).

> The remaining aggravator is based on Witter's 1986 conviction for assault with a deadly weapon resulting in great bodily injury.  The evidence at the penalty hearing showed that after returning from a night out, Witter's ex-girlfriend, Gina Martin, and David Rumsey were talking when they heard glass breaking in the carport.  Witter was outside screaming and breaking the glass out of the car.  When Rumsey stated that he did not want to fight, Witter stabbed him in the midsection with a butcher knife.  Rumsey ran into the house, and Witter chased him.  Rumsey was able to lock himself in the master bedroom until paramedics and police arrived.  Witter was arrested and taken to the jail for booking, during which he told police that he "wanted to kill Rumsey and was sorry that he didn't do it."  Rumsey spent four weeks in the hospital recovering from numerous cuts to his intestines and bowels.  Witter was charged with attempted murder and assault with a deadly weapon and pleaded guilty to the lesser offense.

> As mitigating evidence, several members of Witter's family testified that Witter's mother was an alcoholic drug user, his father was a convicted felon with drug and alcohol problems, and he suffered physical abuse as a child.  Evidence was presented that Witter began abusing drugs and alcohol at the age of 12.  In addition, psychologist Lewis Etcoff testified that (1) Witter had an IQ of 83 (which was "low average"), (2) he had a history of drug abuse and was alcohol and drug dependent, (3) Witter's family was dysfunctional, and (4) on one occasion Witter's uncle had fondled Witter's genitalia.  Dr. Etcoff diagnosed Witter with Antisocial Personality Disorder and, because he had no other evidence to support his conclusions, he only provisionally diagnosed Witter with Attention Deficit Hyperactivity Disorder and

---

[4]  In *McConnell*, the Nevada Supreme Court ruled that it is "impermissible under the United States and Nevada Constitutions to base an aggravating circumstance in a capital prosecution on the felony upon which a felony murder is predicated."  *McConnell*, 102 P.3d at 624.

Developmental Arithmetic Disorder.  Finally, Witter's sister testified that on the night of the murder Witter had just been told by his girlfriend that she had obtained an abortion of the child they were expecting.  Dr. Etcoff testified that Witter had told him the same thing.

We conclude beyond a reasonable doubt that the jury would have found Witter death eligible absent the felony aggravating circumstances.  The remaining aggravator is compelling and involved a violent attack in which Witter stabbed the victim with a seven-inch butcher knife and cut the victim's bowels in ten places, almost killing him.  On the other hand, the mitigating circumstances – that Witter:  (1) was under the influence of an extreme mental or emotional disturbance, (2) came from a dysfunctional family with alcohol and substance abuse and psychological issues, (3) had below average intelligence, (4) had possible Attention Deficit Hyperactivity Disorder, (5) had possible Antisocial Personality Disorder, and (6) had possible Developmental Arithmetic Disorder – are not particularly compelling.

We further conclude beyond a reasonable doubt that the jury would have selected the death penalty.  Evidence was presented of Witter's numerous misdemeanor convictions for being drunk in public, resisting arrest, vandalism, disturbing the peace, DUI, and hit and run, as well as his arrests for arson, resisting arrest, fighting, drunk driving, burglary, vandalism, and various drug offenses.  Evidence was also presented that Witter had been incarcerated as a juvenile for rape.  In addition, the State presented evidence that Witter was affiliated with a gang, had committed acts of domestic violence, and that while in jail he had been found with a shank.  In conjunction with the victim impact testimony of James Cox's family, including the testimony of his widow who had personally witnessed and survived the attack, we conclude that it is beyond a reasonable doubt that the jury would have selected the death penalty.

Accordingly, the district court did not err in denying Witter relief because he failed to demonstrate actual prejudice and thus his *McConnell* claim was procedurally barred.  *See Bejarano*, 146 P.3d at 270-71.

ECF No. 184-1, p. 4-8 (footnotes omitted and citation format modified).

Respondents argue that this court's consideration of Claim Four is barred by the doctrine of procedural default.  Although the Nevada Supreme Court concluded that Witter's underlying *McConnell* claim was procedurally barred, the focus of Witter's claim here is the manner in which the Nevada Supreme Court reweighed the evidence after striking the two aggravating circumstances.  Witter did not present Claim Four as an independent issue to the state court, but that is not necessarily an impediment to review by this court.  *See Valerio v. Crawford*, 306 F.3d 742, 758-61 (9th Cir. 2002) (granting penalty phase relief based on Nevada Supreme Court's disposition of

1   petitioner's claim that depravity of mind aggravating circumstance was invalid).

2        In a weighing state like Nevada, there is Eighth Amendment error (i.e., a lack of an

3   individualized sentencing determination) "when the sentencer weighs an 'invalid' aggravating

4   circumstance in reaching the ultimate decision to impose a death sentence." *Sochor v. Florida*, 504

5   U.S. 527, 532 (1992).  As a general matter, when an aggravating circumstance is invalidated, a

6   reviewing court may, short of remanding for re-sentencing, either reweigh the mitigating evidence

7   against the remaining aggravating factors or determine whether the sentencer's consideration of the

8   invalid factor or factors was harmless error.  *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990).

9        According to Witter, the Nevada Supreme Court ostensibly conducted a reweighing analysis

10  under *Clemons*, but ran afoul of the requirements of that case and its progeny by engaging in

11  independent fact-finding as to mitigating circumstances and failing to provide close appellate

12  scrutiny.  This court does not agree.

13       In condoning the use of the reweighing by the state appellate court, the Court in *Clemons*

14  stated:

15          We see no reason to believe that careful appellate weighing of aggravating
    against mitigating circumstances in cases such as this would not produce "measured
16  consistent application" of the death penalty or in any way be unfair to the defendant.
    It is a routine task of appellate courts to decide whether the evidence supports a jury
17  verdict and in capital cases in "weighing" States, to consider whether the evidence is
    such that the sentencer could have arrived at the death sentence that was imposed.

18

19  *Clemons*, 494 U.S. at 748-49.  The Court also held that an appellate court is able to adequately assess

20  any evidence relating to mitigating factors such that the reweighing process can survive

21  constitutional scrutiny where the appellate court is "without the assistance of written jury findings."

22  *Id*. at 750.

23       Even so, Witter appears to argue that the absence of jury findings as to mitigating

24  circumstances in this case renders appellate reweighing unavailable due to the Ninth Circuit's

25  interpretation of *Clemons* in *Valerio v. Crawford*, 306 F.3d 742 (9th Cir. 2002).  The court in *Valerio*

26

made the point that a court, when reweighing under *Clemons*, depends upon facts found by the jury

and does not engage in the "independent *de novo* fact finding" that an appellate court uses when

curing an instructional error in accordance with *Walton v. Arizona*, 497 U.S. 639 (1990). *Valerio*,

306 F.3d at 757. The court was making the distinction between the two types of appellate processes

as part of its rationale for concluding that the state appellate court erred by applying a *Walton*

analysis when the penalty-phase fact-finder was a jury. *Id*. at 758. Beyond the fact that a federal

court of appeals cannot overrule Supreme Court precedent, the court in *Valerio* did not hold that the

absence of jury findings on mitigation forecloses *Clemons*-type reweighing.

Moreover, the Nevada Supreme Court explicitly stated that it had considered all of Witter's

mitigating evidence and rejected the notion that its reweighing involved fact-finding. ECF No. 184-

1, p. 7. In listing the mitigating circumstances it weighed against the aggravating factor, the Nevada

Supreme Court was not usurping the role of the jury, but, rather, was adhering closely to the

requirements of *Clemons*. *See Clemons*, 494 U.S. at 752 ("[B]ecause the Mississippi Supreme

Court's opinion is virtually silent with respect to the particulars of the allegedly mitigating evidence

presented by Clemons to the jury, we cannot be sure that the court fully heeded our cases

emphasizing the importance of the sentencer's consideration of a defendant's mitigating evidence.").

In addition, the Nevada Supreme Court closely scrutinized "the import and effect of invalid

aggravating factors," by "determin[ing] what the sentencer would have done absent the factor[s]."

*Stringer v. Black*, 503 U.S. 222, 230 (1992).

Witter contends that the Nevada Supreme Court's list of mitigating circumstances indicates

that the court omitted other mitigating circumstances. However, an exhaustive list of every

conceivable mitigating circumstance goes beyond what *Clemons* requires. In *Sochor*, the Supreme

Court noted that it does not require "a particular formulaic indication by state courts before their

review for harmless federal error will pass federal scrutiny." *Sochor*, 504 U.S. at 540. While the

*Sochor* Court was referring to harmless error analysis of an invalid aggravating circumstance, federal

17

scrutiny of reweighing under *Clemons* is presumably no more strict.

Witter also argues that the Nevada Supreme Court violated his federal constitutional rights because it did not consider mitigating evidence presented in state post-conviction proceedings when it reviewed his death sentence. For the reasons that follow, the cases cited by Witter to support this position (*Parker v. Dugger*, 498 U.S. 308 (1990); *Richmond v. Lewis*, 506 U.S. 40 (1992); *Styers v. Schriro*, 547 F.3d 1026 (9th Cir 2008)) are not persuasive.

In *Parker*, the Court reversed the defendant's death sentence based on its conclusion that the state supreme court, after invalidating two of the trial court's aggravating factors, had incorrectly determined that the trial court found no mitigating circumstances in sentencing the defendant to death. 498 U.S. at 318. In doing so, the state supreme court failed to follow the required procedure of either reweighing aggravating and mitigating factors or applying harmless error analysis. *Id*. at 321-22. There is nothing in the opinion to suggest, even remotely, that the state appellate court must consider evidence presented in post-conviction proceedings when conducting a harmless error analysis. Likewise, in *Richmond*, the Court suggested that the state appellate court erred by not considering "evidence in mitigation" in its review of the petitioner's sentence (506 U.S. at 49), but the evidence to which the Court was referring was presented at a *resentencing* hearing, not a post-conviction proceeding (*id*. at 43-44).

In *Styers*, the Ninth Circuit found error in the Arizona Supreme Court's failure to consider "all relevant mitigating evidence" in its review of the propriety of the petitioner's death sentence. 547 F.3d at 1035. The mitigating evidence at issue, however, was apparently presented in the petitioner's initial criminal proceeding. *See State v. Styers*, 865 P.2d 765, 777 (Ariz. 1993). The problem, according to the Ninth Circuit, was that Arizona Supreme Court applied a nexus (to the crime) test to exclude the evidence. *Styers,* 547 F.3d at 1035. Thus, *Styers* provides no support for Witter's argument that the Nevada Supreme Court was required to include evidence beyond that presented at trial in conducting its reweighing analysis.

18

In summary, this court is satisfied that the Nevada Supreme Court performed a weighing function that conforms with *Clemons* and its progeny and provided the close appellate scrutiny discussed in *Stringer*.

As a separate ground for asserting that the Nevada Supreme Court violated his constitutional rights by not considering post-conviction mitigating evidence, Witter claims that the court treated him differently than the similarly-situated petitioners in *State v. Haberstroh*, 69 P.3d 676 (Nev. 2003), *State v. Bennett*, 81 P.3d 1 (Nev. 2003), and *Williams v. State*, Case No. 45796 (Nev. June 22, 2007), thereby depriving him of his federal right to equal protection of the law.

In *Myers v. Ylst*, 897 F.2d 417 (9th Cir.1990), the Ninth Circuit reversed the denial of habeas relief to a state prisoner on the ground that the state supreme court had violated the Equal Protection Clause by denying him the retroactive benefit of a new rule of state law, while granting such benefit to another prisoner even though the cases of both were pending on direct review when the new rule was announced.  The court held that "once [a state court] has established a rule it must apply it with an even hand."  897 F.3d at 421 (citation and internal quotation marks omitted).  "The equal protection clause prohibits a state from affording one person . . . the . . . benefit of a ruling . . . while denying it to another." *Id*.

In *Haberstroh*, the lower court had vacated the petitioner's death sentence based on its conclusion that the penalty-phase jury instruction on the depravity of mind aggravator had been unconstitutional.  69 P.3d at 179.  In affirming that decision, a majority of the Nevada Supreme Court noted that the prosecutor had emphasized that particular circumstance in closing argument and that the jury had not heard mitigating evidence that Haberstroh "would now offer in mitigation." *Id*. at 184.  Three dissenting justices opined, however, that Haberstroh's "belated offer of [mitigating] evidence is of no consequence to the decision before this court." *Id*. at 191.

In Witter's case, the Nevada Surpeme Court cited *Haberstroh* as being consistent with its position that "reweighing is limited to the trial record."  ECF No. 184-1, p. 6.  Even if that reference

1   to *Haberstroh* was misplaced, any inconsistency between the Nevada Supreme Court's treatment of

2   Haberstroh and its treatment of Witter does not rise to the level of a constitutional violation

3   warranting habeas relief.  Issuing the decisions six years apart, the court in *Haberstroh* stood

4   divided, as evenly as possible, on the relevant legal issue, while the court in Witter's case cited two

5   post-*Haberstroh* decisions that support its limitation on mitigating evidence.  *Id*.  As a fundamental

6   matter of federalism, a state appellate court must retain the discretion to apply state law without

7   concern that a deviation from prior precedent will be ruled a constitutional violation by the federal

8   court.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (reemphasizing "that it is not the province

9   of a federal habeas court to reexamine state-court determinations on state-law questions").

10        With respect to *Bennett*, the petitioner in that case, Bennett, and Witter were not similarly-

11   situated.  In *Bennett*, the Nevada Supreme Court considered newly-presented mitigating evidence

12   after concluding that the State had failed to disclose it violation of *Brady v. Maryland*, 372 U.S. 83

13   (1963).  *See Bennett*, 81 P.3d at 11 ("Considering the remaining aggravators, the mitigating evidence

14   that the jury heard, and the undisclosed mitigating evidence that the jury did not hear, particularly the

15   evidence regarding Beeson's dominant role in the crimes, we cannot conclude beyond a reasonable

16   doubt that the jury would have imposed the death penalty in the absence of the erroneous aggravator

17   and the State's *Brady* violations.").  Accordingly, the Nevada Supreme Court in *Bennett* had a

18   legitimate reason, a reason not present in Witter's case, to consider the mitigating evidence not

19   presented to the jury.  Witter's reliance on *Williams* is even more perplexing inasmuch as the opinion

20   contains no indication whatsoever that the Nevada Supreme Court, in conducting its reweighing

21   analysis, considered evidence beyond that which presented to the jury.  *See Williams*, Case No.

22   45796 (Nev. June 22, 2007), p. 5-6.

23        Finally, even assuming the Nevada Supreme Court's review of Witter's sentence was

24   constitutionally-flawed, this court must apply its own harmless-error analysis before granting habeas

25   relief.  *Beardslee v. Brown*, 393 F.3d 1032, 1041 (9th Cir. 2004).  That is, it must conduct an analysis

26

1    under *Brecht v. Abrahamson*, 507 U.S. 619, 638, (1993), which asks "whether the Eighth

2    Amendment error had a substantial and injurious effect or influence on the jury's verdict." *Id.*

3    (quotation and citation omitted).  "When a federal judge in a habeas proceeding is in grave doubt

4    about whether a trial error of federal law had 'substantial and injurious effect or influence in

5    determining the jury's verdict' that error is not harmless." *O'Neal v. McAninch*, 513 U.S. 432, 436

6    (1995).

7          To make a harmless error determination here, this court must assess the impact of the three

8    later-invalidated aggravating circumstances on the jury's decision to impose the death penalty.  A

9    review of the penalty phase transcript indicates that none of the three circumstances was a

10   particularly significant part of the prosecutor's penalty phase case.  ECF Nos. 117-7 through 117-15;

11   118-2 through 118-4; 118-6, and 118-7.  Instead, the State presented testimony from police officers

12   and victims about Witter's prior crimes and testimony from family members about the impact of the

13   victim's death in this case.  ECF No. 117-8, p. 21 through 117-13, p. 25.

14         In their arguments in the penalty phase, the prosecutors discussed the later-invalidated

15   aggravators, but did not emphasize them nearly as much as the valid aggravating circumstance and

16   other evidence.  ECF No. 117-7, p. 34 through 117-8, p. 13; ECF No.118-6, p. 18-35; and ECF No.

17   118-7, p. 15-31.  The State's arguments also focused the weaknesses of the defense's case in

18   mitigation and the likelihood that Witter would continue to present a danger while in prison.  *Id.*

19         As noted in the excerpt above, the penalty phase witnesses for the defense consisted of

20   several of Witter's family members and Dr. Etcoff.  The testimony of these witnesses established

21   that Witter was raised by parents, then grandparents, who exposed him to serious substance abuse, as

22   well as physical and emotional abuse, some of which was directed at Witter himself.  Dr. Etcoff also

23   testified as to Witter's substance abuse and mental impairments, and the effects his tumultuous

24   upbringing may have had on his conduct as an adult.  While this evidence was significant, this court

25   shares the view of the Nevada Supreme Court that the it did not come close to equaling the weight of

26

1    the aggravating circumstance.

2         In sum, nothing in the trial court record suggests that the invalid aggravating circumstances

3    could have had a substantial impact on the jury's decision to impose the death penalty. *See*

4    *Beardslee*, 393 F.3d at 1044 ( finding harmless error where it was "not possible to conclude that the

5    [invalid] circumstance . . . was a substantial factor in the jury's decision to impose the death

6    penalty"). No evidence was presented to support those aggravators (in either the guilt or penalty

7    phase) that would not have been presented anyway. And, the State's penalty phase presentation

8    would not have been materially different if they (the invalid aggravators) had been removed from

9    consideration. Accordingly, Witter is not entitled to habeas relief based on Claim Four.

10                                    **Claim Five(B)**

11        In Claim Five(B), Witter alleges that his constitutional rights were violated when the trial

12   court did not allow defense counsel to question prospective jurors as to whether they would be able

13   to consider all three of the available penalties after being informed that Witter had prior violent

14   felonies. Defense counsel's request to make such an inquiry during voir dire was denied by the trial

15   judge on the ground that it would give the defense an unfair advantage.

16        The Nevada Supreme Court adjudicated this claim on direct appeal as follows:

17             In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776
18        (1968), the United States Supreme Court held that the prosecution could properly ask
          a potential juror whether the juror would automatically vote against the death penalty
          regardless of the facts of the case. Likewise, in *Morgan v. Illinois*, 504 U.S. 719, 112
19        S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Court held that the defense was entitled to
          ask a potential juror whether the juror would automatically vote for death regardless
20        of the facts of the case.

21             At trial, the district court denied Witter's request to ask potential jurors the
          following: "If there was evidence that Defendant had a prior felony conviction
22        involving the use or threat of violence, would you still consider all three sentencing
          alternatives in your deliberations?" The district court found that the question violated
23        EJDCR 7.70. Witter contends that the question merely attempts to death qualify the
          jury through the use of a *Morgan* type question, and if the question violates EJDCR
24        7.70, then EJDCR 7.70 violates due process concerns.

25             Incorporated within Witter's question is the statutory aggravator listed in NRS
          200.033(2) (prior felony conviction involving the use or threat of violence). If Witter
26

                                                   22

1   were allowed to ask such a question, he would be able to read how a potential juror
2   would vote during the penalty phase of the trial.  This goes well beyond determining
    whether a potential juror would be able to apply the law to the facts of the case.  We
3   do not read either the *Morgan* or the *Witherspoon* decisions to allow for one side to
    gain such an unfair advantage.  Moreover, the record shows that other questions asked
4   during voir dire properly death qualified the jury.  Since the question touches on an
    anticipated instruction of law during the penalty phase, and inquires into the verdict a
5   juror would return based on hypothetical facts, we conclude that the district court
    properly found that the questions violated EJDCR 7.70.  We also conclude that the
6   restrictions of EJDCR 7.70 are consistent with the holdings in *Morgan* and
    *Witherspoon* and that the rule does not offend due process concerns.  For these
7   reasons, we conclude that the district court did not abuse its discretion when it
    precluded Witter's counsel from asking his proposed question of prospective jurors.

8   *Witter v. State*, 921 P.2d 886, 891-92 (Nev. 1996) (footnote omitted).

9       The voir dire in this case was sufficient to ascertain whether a prospective juror, upon

10  conviction of a capital offense, "would impose death regardless of the facts and circumstances,"

11  which is all that *Morgan* requires.  *See Morgan*, 504 U.S. at 736.  No controlling authority requires,

12  as a matter of federal law, the trial court to allow inquiry into whether a juror would automatically

13  impose the death penalty given the existence of a particular aggravating circumstance.  The Nevada

14  Supreme Court's resolution of Witter's contention that the trial court should have permitted the

15  additional voir dire requested by defense counsel was not contrary to, or an unreasonable application

16  of, clearly established federal law.  Claim Five(B) is denied.

17                          **Claim Seven(A)**

18      In Claim Seven(A), Witter claims that his constitutional rights were violated because the trial

19  court gave an improper instruction on premeditation and deliberation.  According to Witter, the

20  instruction was unconstitutional because it relieved the State of its burden of proof on an essential

21  element of first degree murder and permitted Witter's conviction for first degree murder "even if his

22  determination to kill was a 'mere unconsidered and rash impulse' or 'formed in passion.'"  ECF No.

23  167, p. 181 (quoting *Byford v. State*, 994 P.2d 700, 714 (Nev. 2000)).  He also claims that, but for

24  the improper instruction, there is a reasonable probability the jury would have returned a different

25  verdict.

26

                                        23

1    The instruction on premeditation and deliberation that Witter claims was defective read as

2    follows:

3        Premeditation is a design, a determination to kill, distinctly formed in the
         mind at any moment before or at the time of the killing.

4
         Premeditation need not be for a day, an hour or even a minute.  It may be as
5        instantaneous as successive thoughts of the mind.  For if the jury believes from the
         evidence that the act constituting the killing has been preceded by and has been the
6        result of premeditation, no matter how rapidly the premeditation is followed by the
         act constituting the killing, it is willful, deliberate and premeditated murder.

7

8    ECF No. 116-10, p. 11.

9    The Nevada statutes define first degree murder, in relevant part, as a "willful, deliberate and

10   premeditated killing."  Nev. Rev. Stat. § 200.030(1)(a).  The use of the challenged instruction was

11   condoned by the Nevada Supreme Court in *Kazalyn v. State*, 825 P.2d 578 (Nev. 1992), and is

12   commonly referred to as the *Kazalyn* instruction.  Eight years after *Kazalyn*, the Nevada Supreme

13   Court ruled, in *Byford*, that the instruction was deficient because it defined only premeditation and

14   failed to provide an independent definition for deliberation.  *See Byford*, 994 P.2d at 713.

15   An overview of the state and federal court jurisprudence involving the *Kazalyn* instruction is

16   set forth in *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013).  *Babb*, 719 F.3d at 1026-28.  In *Babb*,

17   the Ninth Circuit held that its prior holding in *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007),

18   regarding the constitutionality of the *Kazalyn* instruction is no longer good law in light of

19   intervening Nevada Supreme Court decisions.  *Id*. at 1030.  The court did hold, however, that it was

20   a violation of due process to not apply the change in the law announced in *Byford* in cases in which

21   the conviction was not final at the time of the *Byford* decision.  *Id*. at 1032.

22   Here, Witter's conviction became final several years before the *Byford* decision.  After *Babb*,

23   Witter is left with no viable argument that the use of the *Kazalyn* instruction resulted in a violation of

24   his constitutional rights.  Witter's assertion that the holding in *Babb* is non-binding dictum with

25   respect to his case has no merit.  The question of whether the instruction amounted to a

26

24

constitutional violation of the type Witter alleges here was squarely before the court in *Babb*; and, the court unequivocally concluded that it did not. *Babb*, 719 F.3d at 1029-30.

Moreover, even if a constitutional violation occurred, Witter would be entitled to relief only if the error was not harmless. *See Babb*, 719 F.3d at 1033 (applying *Brecht* to the same constitutional error at issue in this case). "Generally, . . . when considering whether erroneous instructions constitute harmless error, courts ask whether it is reasonably probable that the jury would still have convicted the petitioner on the proper instructions." *Id*. at 1034 (citation omitted). Any error based on the instruction at issue was harmless in this case for the same reason it was harmless in *Babb* – that being that the jury undoubtedly found Witter guilty of first degree murder by means of the felony murder rule. *See id.* at 1034. The jury found Witter guilty of sexual assault and burglary, and the facts in this case leave no doubt that the victim James Cox was killed in perpetration of these crimes.

Claim Seven(A) is denied.

**Claim Ten(C)**

In Claim Ten(C), Witter alleges that his constitutional rights were violated as a result of the State introducing testimony from the victim Kathryn Cox that was beyond the scope of admissible victim-impact evidence, as determined by the Supreme Court. According to Witter the following comments in Cox's testimony fall into this category:

The events of November 14, 1993, demand that you show this defendant no mercy.

ECF No. 117-13, p. 22.

> William Witter viciously and brutally murdered my husband James Cox. William Witter perpetrated unconscionable acts of violence directed at me and then my husband. My greatest fear is that William Witter would inflict the same violent acts of destruction on some other unsuspecting victim.
>
> I have waited and worked very hard so that I could be here and face the murderer of my husband. I'm here today to do everything in my power to see that William Witter receives no mercy.

25

1    *Id.*, p. 23-24.

2    At the conclusion of Cox's testimony, Witter's counsel moved for a mistrial on the ground that her

3    testimony went beyond the purview of admissible victim-impact testimony. *Id.*, p. 33-34.  The trial

4    court denied the motion.

5         On direct appeal, the Nevada Supreme Court rejected Witter's claim as follows:

6              At the penalty hearing, Kathryn Cox read a prepared statement to the jury in
         which she demanded that the jury show no mercy to the defendant, and in which she
7         informed the jury that she intended to do everything in her power to see that Witter
         received no mercy.  Witter made a motion for mistrial, arguing that Kathryn's
8         statements went beyond the scope of what is acceptable as a victim-impact statement
         since the statements unduly inflamed the passions of the jury and that they amounted
9         to a plea for the return of a death penalty sentence.  The district court denied Witter's
         motion.  Witter now argues that he was deprived of a fair trial and that the district
10        court abused its discretion when it denied his motion for mistrial.

11             In *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d
         720 (1991), the Supreme Court overruled prior precedent and held that if a State
12        chooses to permit the admission of victim impact evidence and prosecutorial
         argument on that subject, the Eighth Amendment erects no *per se* bar.  In *Howick v.*
13        *State*, 108 Nev. 127, 825 P.2d 600 (1992), we applauded the decision reached in
         *Payne* and concluded that the decision comports with the principles of the Nevada
14        Constitution.  NRS 175.552(3) states, in part, that "[i]n the [penalty] hearing,
         evidence may be presented concerning aggravating and mitigating circumstances
15        relative to the offense, defendant or victim and on any other matter which the court
         deems relevant to sentence, whether or not the evidence is ordinarily admissible."
16        However, while a victim may address the impact that the crime has had on the victim
         and the victim's family, a victim can only express an opinion regarding the
17        defendant's sentence in non capital cases.  *Randell v. State*, 109 Nev. 5, 846 P.2d 278
         (1993).
18
              We conclude that in asking the jury to "show no mercy," Kathryn was not
19        expressing her opinion as to what sentence Witter should receive.  Rather, we believe
         that Kathryn was only asking that the jury return the most severe verdict that it
20        deemed appropriate under the facts and circumstances of this case.  Kathryn's
         statements also emphasize the devastating effect this crime has had on her and her
21        family's life.  Such sentiments are admissible victim-impact statements.  NRS
         175.552(3).  We therefore conclude that Witter was not deprived of a fair trial and
22        that the district court properly denied Witter's motion for mistrial.

23   *Witter*, 921 P.2d at 895-96.

24        One of the Supreme Court cases *Payne* overruled is *Booth v. Maryland*, 482 U.S. 496

25

26
                                                26

(1987).[5]  A footnote to the majority opinion in *Payne* strongly suggests that, while the Court was lifting the *per se* ban on victim-impact testimony, it was leaving intact the *Booth* Court's holding that "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment."  *Payne*, 501 U.S. at 830 n.2.

The Nevada Supreme Court recognized that some types of victim-impact testimony remained off limits post-*Payne*, but concluded that Cox did not express an opinion about the appropriate sentence for Witter.  The Nevada Supreme Court may have erred in not concluding that Cox's testimony was the type of testimony prohibited under *Booth*, but "fair-minded jurists could disagree."  *Yarborough*, 541 U.S. at 664.  Accordingly, this court must defer to the Nevada Supreme Court's decision.

In addition, the admission of the allegedly improper testimony amounted to harmless error in this case.  In arguing that it was not, Witter elides the distinction between the entirety of Cox's testimony and the brief excerpts that he alleged to be improper in his petition.  Much of Cox's testimony appropriately addressed the personal characteristics of the victim and the impact of Witter's crimes on the remaining family members.  And, as noted above, the bulk of the State's case in the penalty phase was premised on Witter's history of violent crimes.  There is not a reasonable possibility that, but for Cox's allegedly improper testimony, the jury would have returned a more favorable verdict.  *See Brecht*, 507 U.S. at 637 (defining harmless-beyond-a-reasonable-doubt standard as no "'reasonable possibility' that trial error contributed to the verdict").

Claim Ten(C) is denied.

### Claim Fourteen

In Claim Fourteen, Witter alleges that he is entitled to relief because of cumulative error.  Under Ninth Circuit precedent, habeas relief may be available based on the aggregate effect of

---

[5]  The other is *South Carolina v. Gathers*, 490 U.S. 805 (1989).

27

multiple errors even though the errors considered in isolation do not rise to the level of a constitutional violation.  *See Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2003).  "[C]umulative error warrants habeas relief only where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Witter has not established the existence of multiple errors in the guilt phase of his trial. Moreover, evidence of Witter's guilt was overwhelming and incontrovertible.  As set forth above, Witter's claims of error in the penalty phase of his trial are, for the most part, without merit.  The cumulative impact of any errors occurring in the penalty phase falls well short of rendering it fundamentally unfair.

Claim Fourteen is denied.

V.  CONCLUSION

For the reasons set forth above, Witter is not entitled to habeas relief.  In addition, the court, having scrutinized the merits of Witter's claims, stands by its prior decision to deny an evidentiary hearing (see ECF No. 246, p. 7-8).

*Certificate of Appealability*

This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484

28

1  (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA

2  will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the

3  denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

4         Having reviewed its determinations and rulings in adjudicating Witter's petition, the court

5  finds that reasonable jurists could debate the court's resolution of Claim Four – i.e., whether Witter

6  is entitled to relief based on his claim that the Nevada Supreme Court conducted a constitutionally-

7  flawed reweighing analysis after invalidating all but one of the aggravating circumstances found by

8  the jury.  The court declines to issue a certificate of appealability for its resolution of any procedural

9  issues or any of Witter's other habeas claims.

10        **IT IS THEREFORE ORDERED** that petitioner's second amended petition for writ of

11 habeas corpus (ECF No. 167) is DENIED.  The Clerk shall enter judgment accordingly.

12        **IT IS FURTHER ORDERED** that a Certificate of Appealability is granted with respect to

13 the following issue:

14        Whether the Nevada Supreme Court conducted a constitutionally-flawed
   reweighing analysis after invalidating all but one of the aggravating circumstances
15     found by the jury.

16        **IT IS FURTHER ORDERED** that petitioner's motion for evidentiary hearing (ECF No.

17 229) is DENIED with prejudice.

18        DATED:  August 12, 2014

19

20        _____

21        UNITED STATES DISTRICT JUDGE

22

23

24

25

26

29